IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ELIZABETH LAURA CHOIKE, et al.,            )
                                            )
            Plaintiffs,                     )
                                            )
   -vs-                                     )
                                                Civil Action No.  06-622
                                            )
SLIPPERY ROCK UNIVERSITY OF PENNSYLVANIA )
OF THE STATE SYSTEM OF HIGHER EDUCATION, )
et al.,                                     )
                                            )
            Defendants.                     )

AMBROSE, Chief District Judge.

## **FINDINGS OF FACT**

## **CONCLUSIONS OF LAW**

and

## **ORDER OF COURT**

## **FINDINGS OF FACT**

### A.  **BACKGROUND**

1.    Plaintiffs Elizabeth Laura Choike, Ashley Guinevere Stoner, Heather Walbright, Jessica Student, Jennifer Venet, Elizabeth Penning, Laura A. Sanford, Emily C. Campbell, Rebecca Zinn, Alison Nicole Nuckols, Sarah S. Sander and Rachael Bienias are female student athletes ("Student Plaintiffs") who attend Defendant Slippery Rock University of Pennsylvania of the State System of Higher Education ("SRU").

1

2.  Plaintiff James V. Yeamans was the coach of the women's water polo team from 1998 through June of 2006.  He also served as the coach of the women's swimming teams at SRU during the 2005-2006 school year.  He has been, and is currently, employed by SRU as the manager of the Aebersold Student Recreation Center ("the Rec Center").

3.  Defendant SRU is a public corporation that is a member of the Pennsylvania State System of Higher Education and receives federal financial assistance.

4.  Defendant Robert Smith, who is being sued in his official capacity, is the President of SRU.  He is responsible for SRU's overall operations and for ensuring that the university complies with all federal and state non-discrimination mandates.

5.  Defendant Paul Lueken, who is also being sued in his official capacity, is the Director of Athletics at SRU.   He is responsible for managing the Athletic Department's personnel, budget, fund-raising and revenue efforts, athletic events and campus athletic facilities.  He also oversees compliance with all applicable rules and regulations of the National Collegiate Athletic Association ("NCAA") and with Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681-88 ("Title IX").

6.  On or about January 30, 2006, SRU announced that, for budgetary reasons, it would eliminate eight varsity sports.  Those sports consisted of men's and women's swimming, men's and women's water polo, women's field hockey, men's golf, men's wrestling and men's tennis.

7.  Choike, Penning, Student and Walbright have participated in the past as members of SRU's women's varsity swim team.  But for the announced elimination

of their team, they planned to continue as varsity swimmers.  There is enough interest and support from the student body to field a competitive women's varsity swim team.

8.  Choike, Sandford and Walbright have participated in the past as members of SRU's women's varsity water polo team.  But for the announced elimination of their team, they planned to continue as varsity water polo players.  There is enough interest and support from the student body to field a competitive women's varsity water polo team.

9.  Shortly after learning of SRU's announcement, the Student Plaintiffs met and formed a committee - S.O.S.- "Save Our Sports."  The Committee circulated petitions and organized rallies to protest the elimination of the teams.

10.  The Student Plaintiffs also succeeded in retaining counsel.

11.  Counsel then met with SRU representatives in an attempt to discuss the status of the athletic programs at SRU.

12.  Unsatisfied with the outcome of that meeting, Plaintiffs then commenced this action to challenge SRU's alleged failure to provide equitable athletic opportunities for its female students and equitable treatment of its female student athletes.  Plaintiffs assert that SRU has intentionally discriminated against them based upon their sex.

13.  The Complaint, styled as a class action, consists of two counts.  Count I is asserted under Title IX of the Education Amendments of 1972, 20 U.S.C. sections 1681-88 ("Title IX"), for the violation of Title IX's equal participation requirement.

Count II, also brought under Title IX, is based upon SRU's failure to treat female athletes substantially equally with respect to coaching and training, equipment and supplies, publicity, promotional materials and events, transportation, uniforms, playing fields, locker rooms and other facilities.

14.  The Plaintiffs also filed a Motion requesting preliminary injunctive relief. More specifically, Plaintiffs seek the immediate reinstatement of women's swimming and women's water polo programs[1] and the appointment of coaches, scheduling of competition and provision of all other benefits normally associated with varsity status at SRU.

15.  This Court held a hearing on the Motion for Preliminary Injunction on June 14, 2006.

**B.  History of Title IX Compliance at SRU**

16.  SRU has not been compliant with Title IX and is fully aware of its failure in this regard.   In December of 2000, SRU retained Alden & Associates ("Alden") to perform a Title IX compliance report. See Ex. 26.

17.  Using the 1999-2000 Equity in Athletics Disclosure Act ("EADA") institutional data, Alden determined that the undergraduate student population at SRU for that academic year was 5,532. Of that population, 2,433 were male undergraduates (or 44%) and 3,099 were female undergraduates (or 56%).  Alden also determined that the male student-athlete population was 365, or 59% of the student athlete

---

[1] Initially, SRU announced that it would also eliminate the women's varsity field hockey team.  At some point between the January 30, 2006 announcement that the teams identified above would be eliminated and the hearing on the Motion for Preliminary Injunction, SRU decided that it would reinstate the women's field hockey team.

population.  In contrast, the female student athlete population was 254, or 41% of the student athlete population.

18.    Thus, the differential between female undergraduate students and female undergraduate student athletes was 15%.  Alden concluded that a 15% disparity would be viewed unfavorably and would not satisfy Title IX's substantial proportionality test.

18.  Alden also concluded that SRU was not compliant with Title IX with respect to the provision of financial assistance, equipment, uniforms, facilities, coaching recruitment funds and publicity as it related to women.

20.    Alden also advised SRU that it did not have a "history and continuing practice of program expansion."  In this regard Alden noted that SRU had not added a women's varsity team since 1993. See Ex. 26, p. 30.

21.  Alden also predicted that SRU would not be found compliant with respect to accommodating the interests and abilities of its female students.   More particularly, Alden noted that there was no formal avenue for students to offer information regarding their interests and abilities.

22.   Alden concluded its review by strongly recommending that SRU offer another women's varsity sport.

23.  SRU did not follow that advice.

24.  SRU has not cured the shortcomings identified by Alden in the years since the 2001 review.  Indeed, Leuken testified that SRU has been unsuccessful in achieving substantial proportionality in the last five years.

25.  On November 8, 2005, Kimberly Greco, Director of Internal Audit at SRU, prepared a summary of the EADA / NCAA Report. See Ex. 29.  Greco included figures regarding the participation opportunities for years 2001 through 2005.  According to her calculations, those seasons were marked with participation disparities of 12.3%, 11.2%, 8.7% and 8.7%.

26.  Leuken conceded that there has been a differential of at least 5.8% in substantial proportionality each year from 2001 through 2005 and Smith acknowledged that he was aware of this gap from the time he was appointed president in 2004.

27. Greco concluded that "[t]he Athletic Department continues to not be in compliance with portions of the Title IX regulation." Id, p. 1.  Significantly, Greco noted that the disparity in treatment of men versus women had actually increased with respect to the percentage of coaching and the recruitment of student athletes.

28. As to "Fully and Effectively Accommodating the Interests and Abilities of the Underrepresented Sex," Greco found SRU to be fully compliant.  She stated that "[a] formal sports interest survey was conducted by the Athletic Department in 2004," and that the results of the study show that "the athletic needs and interests of female students are currently being met… ." Id., p. 2.

29.  I find this conclusion to be unpersuasive, as it was completed before the elimination of the sports teams at issue.

**C.  Elimination of the Programs at Issue**

30.  In 2005, the Board of Governors of the State System made clear that there would, again, be serious revenue shortfalls.  In prior years, SRU had made cuts in academic programs, administration and student services.  Accordingly, Smith determined that the Athletic Department would have to sustain cuts.

31. At that time, SRU sponsored 23 varsity programs.  Rather than implement cuts to all 23 teams, Smith deemed it preferable to simply eliminate a certain number of teams.

32. Smith and Leuken both knew, before this process began, that SRU was not compliant with Title IX.  Accordingly, I find that their actions in eliminating several women's programs in violation of Title IX was intentional.

33.  To cut these programs, Smith developed a spreadsheet with a set of criteria by which all 23 teams would be assessed and ranked.  By approaching the elimination of certain teams in this manner, Smith hoped to make his decision as objective and factual as possible. See Ex. 18.

34.  He rejected recommendations by the University Athletic Council to take into consideration gender equity and Title IX compliance.  Smith testified that he wanted to keep financial decisions completely separate from Title IX decisions. The spreadsheet Smith used included both financial data, reflecting the costs and revenues associated with each team, and non-financial evaluative measures, such as how competitive each team was, the academic performance of the student-

athletes,[2] the quality of the coaching staff and the condition of the facilities.

35. Once Smith had completed the spreadsheet, he and then-Vice President for Student Life Robert Watson ("Watson") determined which teams to cut.

36. As stated above, on January 30, 2006, SRU announced its decision to eliminate men's wrestling, men's tennis, men's golf, men's and women's swimming, women's water polo and women's field hockey.

37. Smith testified that the condition of the pool facilities at the Morrow Field House played a significant part in the decision to eliminate SRU's aquatic athletic programs.  Smith believed that the pool facilities would require in excess of $1 million to make needed capital improvements.  He believed that it did not make financial sense to invest in and maintain these water sports teams when to do so would require a significant and financially prohibitive investment at a time when SRU was in a financial crisis.

38. Yeamans disagreed that the pool facilities required such a large investment.  He described it as being in a similar condition as the pools at other schools where SRU competes.

39. The pool has passed inspection by the Commonwealth and is useable.

40. The pool was used in the 2005-2006 academic year for physical education classes, it is being used this summer in connection with certain camps and

---

[2] In this regard, Smith employed a facially discriminatory academic criterion, in that he set a higher threshold for women athletes to retain their teams.  Smith explained that the grade point average and academic performance would be based on the average for each gender.  The women's academic average at SRU is higher than the men's. Smith explained at the hearing that "for a woman's team, they would have to have a higher grade point average [than the men] to be graded exceptional in [his] grid." Transcript, 132:21-133.1.

conferences, and it is scheduled to be used in the Fall for physical education classes.

41. In addition, a regulation size pool exists in the Rec Center.   Yeamans testified that it would be suitable for use for both the women's swimming team and the women's water polo team.

42. It would cost approximately $65,000 to reinstate the women's swimming and women's water polo team for the 2006-2007 academic year.

**D.  SRU's Roster Management Plan**

43. Smith and Leuken knew that SRU was not Title IX compliant at the time SRU eliminated the athletic programs.

44. Thus, in late March of 2006, SRU began to consider how it might remedy the Title IX violations.

45. Smith determined that SRU would achieve Title IX compliance through "roster management."   That is, SRU would, in most cases, reduce the available number of athletic opportunities for each men's team and increase the number of athletic opportunities for each women's team.  Smith believed SRU could achieve "proportionality" for Title IX in this manner.

46. SRU had previously, and unsuccessfully, employed "roster limits" as a means to Title IX compliance.  In the past, roster limits and targets were set as goals to assist in achieving proportionality, but there were no repercussions for failing to meet a limit or target.  Smith explained that "this time," the limits would be binding.

47. Smith left the goal of achieving roster limits to the coaches.  Smith gave the coaches a mathematical formula, by which the coaches could determine how

many athletic opportunities had to be added for the female students in order to retain the desired number of athletic opportunities for the male students. The coaches met on two occasions and negotiated the limits each team would face.

48. On May 1, 2006, the coaches presented to Smith the "SA's on Roster." See Ex. A.  The submission called for the reduction of athletic opportunities on existing men's teams from 271 to 240.  At the same time, it called for the increase in the number of athletic opportunities for women from 235 to 288.  If achieved, the coaches believed, SRU would be Title IX compliant, with a proportionality ratio of less than 1%.

49. To accomplish this task, however, SRU planned on reinstating women's field hockey, on establishing a women's varsity lacrosse team, and by increasing the number of positions available to female student athletes on the existing teams.

50. With respect to the newly created women's lacrosse team, Smith and Leuken believe that they can field 24 players, despite the fact that the women's club lacrosse team had only 17 members during the 2005-2006 academic year.

51. The elevation of the club lacrosse team to varsity status was not done in response to requests from the team itself, or from the student body in general. SRU has in place a procedure by which a club team can request elevation to varsity status.  Nobody had availed themselves of this procedure with respect to the lacrosse team.

52. Nevertheless, SRU decided to sponsor women's lacrosse team for several reasons.  First, SRU thought the sport was a synergistic complement to field hockey

in that one coach could be hired full time to coach both teams.  Second, SRU believed that lacrosse is a sport growing in popularity and would provide an ample, regional, recruiting base.

53. Given the lack of expressed student interest in the creation of a women's varsity lacrosse team, the allotment of 24 positions to this team, the fact that no coach has been hired, that no players have been recruited, and that no scholarship funds have been set aside, SRU's citation to this team as a means of achieving substantial proportionality is not particularly meaningful.

54. Neither is SRU's plan to achieve proportionality through the use of roster limits.

55. Testimony elicited at the hearing indicated that, in the past, any female student-athlete who sought to participate in a varsity sport (other than basketball) was permitted to remain on the roster.  Accordingly, it would seem that the proposed increase in roster size of those sports (ie., cross country, soccer, softball, tennis and lacrosse) would be a paper increase only.  SRU could simply designate the "addition" of these positions without actually expecting that they be filled.

56. Neither Lueken or Smith indicated that there would be any female student-athletes who would fill these positions.  Nor did they indicate that the recruiting budget for these sports has been increased, or that the scholarship funds for these sports have been increased.

## CONCLUSIONS OF LAW

57. To prevail on a request for preliminary injunctive relief, the Plaintiffs must

11

persuade me of:

> (1) the likelihood of their success on the merits of their case;
> (2) the probability of sustaining irreparable harm in the absence of injunctive relief;
> (3) a minimal amount of harm to SRU if relief is granted; and
> (4) that the public interest favors the grant of injunctive relief.

See Alessi v. Commw. of Pa. Dept. Of Public Welfare, 893 F.2d 1444 (3d Cir. 1990).

## A.   LIKELIHOOD OF SUCCESS

58.  The Plaintiffs have set forth claims of intentional discrimination under Title IX.

59.  SRU is a public university and receives federal funding.  Accordingly, it must comply with the dictates of Title IX.

60.  Title IX prohibits discrimination on the basis of sex by educational institutions that receive federal financial assistance. In particular, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. Section 1681(a)(2000).

61.  The regulations enacted to implement Title IX provide that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such

basis." 34 C.F.R. Section 106.41(a).

62.   The regulations further provide that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide *equal athletic opportunity* for members of both sexes." 34 C.F.R. Section 106.41(c) (italics added).

63.   "Equal opportunity" is defined by the following program factors:

> (1) whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes;
> (2) the provision of equipment and supplies;
> (3) the scheduling of games and practice times;
> (4) travel and per diem allowances;
> (5) opportunity to receive coaching and academic tutoring;
> (6) assignment and compensation of coaches and tutors;
> (7) provision of locker rooms, practice and competitive facilities;
> (8) provision of medical and training facilities and services;
> (9) provision of housing and dining facilities and services; and
> (10) publicity.

34 C.F.R. 106.41(c).

64. For purposes of Plaintiffs' request for preliminary injunctive relief, I focus on whether SRU's "selection of sports … effectively accommodates the interests and abilities of members of both sexes."

65. The Policy Interpretations published by the Department of Education's Office of Civil Rights ("OCR") outlines a three part test to determine compliance in the area of accommodation:

> (1) whether intercollegiate level participation opportunities for male and female students are provided

13

in numbers substantially proportionate to their respective enrollment (the "substantial proportionality prong");
(2) where the members of one sex have been and are underrepresented among intercollegiate athletics, where the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex (the "history of continuing expansion prong"); or
(3) where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as cited above, where it can be demonstrated that the interests and abilities of the members of the sex have been fully and effectively accommodated by the present program.

Barrett v. West Chester Univ. Of Pa., Civ. No. 3-4978, 2003 WL 22803477 at * 5 (E.D. Pa. Nov. 12, 2003), citing, 44 Fed. Reg. 71, 418 (Dec. 11, 1979).

66.   The Department of Education's regulations implementing Title IX are entitled to deference under Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984).  "The degree of deference is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX." Cohen v. Brown Univ., 991 F.2d 888, 895 (1st Cir. 1993).

67.   Plaintiffs have the burden of demonstrating that SRU has not complied with the substantial proportionality prong.

68.   If Plaintiffs are successful in this regard, then the burden shifts to SRU to demonstrate compliance under either the second or third prongs.

69.   After careful consideration, I conclude that Plaintiffs have proven that SRU has failed the substantial proportionality test.

70.   As SRU, Smith and Leuken concede, and the evidence unequivocally establishes, SRU has never satisfied the substantial proportionality test since the inception of Title IX more than twenty-five years ago.

71.   Rather than argue that it is currently compliant with the substantial proportionality prong, SRU urges that it will <u>become</u> compliant - that it has <u>plans</u> to be compliant in the 2006-2007 academic year through the use of roster management.

72.   Having a plan to ameliorate inequities is not the same as having ameliorated them.

73.   SRU's plan, while laudable, is not convincing at this stage.   As SRU admitted, attempts to achieve substantial proportionality through roster limits in the past have failed.   Leuken conceded that he permitted coaches of men's teams to increase roster size, despite established limits and despite knowledge that SRU was then in violation of Title IX, in the past in order to make those teams "competitive."   I am hard pressed at this juncture to believe it might not happen again.

74.   Further, the increase in roster size for the majority of women's teams appears to be purely artificial.   Smith himself stated that the number of positions allocated was derived, not from any research as to the needs or wants of the female students, but based purely on the number of positions that coaches wanted to make available to the male athletes.

75.   Indeed, SRU offered no other explanation as to why, for instance,

women's softball should be allocated four more positions, why women's tennis should be allocated three more positions, or why women's soccer and women's cross-country should each be allocated two more positions.

76.  There certainly was no indication that there had been a sudden increase of interest by SRU's female students in these programs.

77.  In light of Smith's testimony that he instructed the coaches not to "pad" teams with unnecessary players and his admonition that he did not want teams comprised of "bench warmers," who would be denied the opportunity to compete in a meaningful way, I find it odd that women's cross country would be allocated 28 positions, while men's cross country would be allocated only 16 positions, or why men's soccer would be allocated 25 positions, while women's soccer would be allocated 28.

78.  Indeed, SRU's approach is strange given that in past years, no cuts were made to any women's varsity team (except for basketball).  Thus, any woman who expressed an interest in participating in a program was permitted to do so.

79.  As such, there is no indication that the current SRU female student population would actually fill these newly created positions.

80.  Nor did SRU proffer any evidence that it had increased the budget for recruiting or the scholarship funds available for these sports.

81.  Under SRU's theory of roster management, it could have accorded 50 positions to women's soccer and eliminated the basketball and tennis programs entirely. While the allocated positions might satisfy the proportionality requirement

if viewed in a vacuum, compliance would not be meaningful.

82.   SRU's elevation of the women's club lacrosse team to varsity status in order to satisfy Title IX is also suspect.   Nobody from the team requested such action.  Nor did any members of the student body request it.  Indeed, SRU did not consult with any students or members of the existing team before deciding to sponsor the team.

83.  SRU allocated 24 positions to women's varsity lacrosse.  The club team had only 17 players on it.  Even assuming that all 17 players returned for the 2006-2007 academic year, there was no testimony from SRU regarding how it planned to fill the remaining 7 positions.

84.   No coach had been hired, no scholarships had been funded, no recruitment had taken place and no players had been placed on the roster at the time of the hearing.

85.  In short, SRU's plans to achieve substantial proportionality through roster management and the addition of women's lacrosse, while laudable, are simply too speculative at this juncture to satisfy Title IX.

86.  Unless and until SRU can demonstrate that those additional positions are meaningful - i.e., filled, they have not complied with the substantial proportionality prong of Title IX.

87.  Neither can SRU satisfy the second prong of Title IX compliance - that it has a history and continuing practice of program expansion for women's varsity teams.  SRU has not added a women's varsity team since 1993, despite having full

knowledge that it was in violation of Title IX.  Indeed, the consultant retained to review SRU's Title IX compliance explicitly recommended that SRU consider offering another women's varsity sport.  SRU declined.

88.  While there is no fixed interval of time within which an institution must have added participation opportunities, periods in excess of a decade are too long to constitute continued expansion." <u>Barrett</u>, 2003 WL 22803477 at * 7.

89.  Certainly, there may be instances where a school cannot satisfy the first or second prongs of Title IX simply because its female students are not interested in athletic programs.

90.  A recent column run in the Pittsburgh Post Gazette by John Tierney, a syndicated columnist from the New York Times, suggested that it was unfair to require schools to cut men's athletic programs to satisfy Title IX's substantial proportionality requirement where those schools do not have enough female student athletes.  Yet Title IX allows a school to satisfy Title IX without cuts to men's programs if it can demonstrate that it is fully and effectively accommodating the interests of its female students.

91.  Here, SRU cannot satisfy this third prong because it has eliminated two viable women's teams which the student body has demanded be reinstated.  SRU is not fully and effectively accommodating the interests of its female students.

92.  I therefore conclude that the Plaintiffs have demonstrated a likelihood of success on the merits of their claims.

**B.  <u>IRREPARABLE HARM</u>**

93.   Plaintiffs have demonstrated a likelihood of irreparable harm if the preliminary injunction is not granted.

94.   To paraphrase the court in <u>Favia v. Indiana University of Pa.</u>, 812 F. Supp. 578, 583 (W.D. Pa. 1993), by cutting the women's water polo and swim teams, SRU has denied the Student Plaintiffs the benefits accorded to women athletes who compete interscholastically: they develop skill, self-confidence, learn team cohesion and sense of accomplishment, increase their physical and mental well-being, and develop a lifelong healthy attitude.  The harm emanating from lost opportunities for the Student Plaintiffs is irreparable.

**C.   <u>HARM TO SRU</u>**

95.   I find SRU's arguments that it would suffer substantial harm if injunctive relief is granted to be unpersuasive.

96.   In so finding, I do not mean to minimize SRU's valid concern of judicial interference with its independence in deciding how to allocate its limited financial resources.

97.   "Title IX does not purport to override financial necessity.  Yet, the pruning of athletic budgets cannot take place solely in comptroller's offices, isolated from the legislative and regulatory imperatives that Title IX imposes." <u>Cohen II</u>, 991 F.2d at 905 (citations omitted).

98.   Here, SRU did precisely that.  Knowing that SRU was not compliant with Title IX, Smith nevertheless decided not to consider Title IX compliance in determining which teams to eliminate.

19

99. I do not mean to suggest that SRU must renovate the Morrow Field House pool[3] or even that SRU must sponsor women's varsity swimming and women's varsity water polo into the distant future.

100. If going forward, SRU can demonstrate that the roster management approach actually works, and that the allocation of athletic participation opportunities to its female students is meaningful, then SRU may be entitled to eliminate the programs at issue.

101. At this juncture, however, SRU has not and the harm to SRU in maintaining these programs for the 2006-2007 academic year (estimated at approximately $65,000.00) is minimal as compared to the harm Student Plaintiffs would suffer if injunctive relief is denied.

## D.   PUBLIC INTEREST

102. "Promoting compliance with Title IX serves the public interest." Barrett, 2003 WL 22803477 at * 15 (citations omitted).

103. SRU urges that the "public interest would seem to favor the use of tax payer dollars to support the essential academic functions of a public university, and thereby encourage a wide and diverse range of academic disciplines and degree programs, rather than provide a specific, extracurricular athletic opportunity for a small number of individual students." See Docket No. 38, p. 20.

104. I do not disagree. Yet SRU has chosen, using tax payer dollars, to offer

---

[3] The current Morrow Field House pool has passed all inspections.  Should SRU determine that the pool is nevertheless too dangerous to use, the pool located in the Rec Center is an adequate substitute.

extracurricular athletic opportunities to its male students in a disproportionally large number for the past twenty five years, despite the mandates of Title IX. Title IX requires that substantially proportionate athletic opportunities be provided to female students as well.

105.   For these reasons, I find that the public interest is best served by ensuring compliance with Title IX.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ELIZABETH LAURA CHOIKE, et al., | ) |
| | ) |
| | ) |
|        Plaintiffs, | ) |
| | ) |
|  -vs- | ) |
| |   Civil Action No.  06-622 |
| | ) |
| | ) |
| SLIPPERY ROCK UNIVERSITY OF PENNSYLVANIA | ) |
| OF THE STATE SYSTEM OF HIGHER EDUCATION, | ) |
| et al., | ) |
| | ) |
| | ) |
| | ) |
| | ) |
|       Defendants. | ) |

AMBROSE, Chief District Judge.

## ORDER OF COURT

AND NOW, this **21st** day of July 2006, after careful consideration, and for the reasons set forth above, it is Ordered that the Plaintiffs' Motion for Preliminary Injunction (Docket No. 4) is GRANTED as follows:

SRU is preliminarily enjoined from eliminating the women's varsity swimming and the women's varsity water polo teams for the 2006-2007 academic year.  To the extent that those teams have been eliminated, SRU should reinstate them, provide the teams with funding, staffing and all other benefits commensurate with their

status as intercollegiate teams.

I note, however, that should SRU be able to demonstrate that its roster management approach to Title IX compliance has actually succeeded, I will consider a modification of this Order.


BY THE COURT:



/S/   Donetta W. Ambrose

 Donetta W. Ambrose,
 Chief U. S. District Judge